## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| CARLOS SANCHEZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO.: |
| ) | |
| TEAM HEALTH, INC.; and PARAGON ) | _____ |
| CONTRACTING SERVICES, LLC, ) | |
| F/K/A PARAGON CONTRACTING ) | |
| SERVICES, INC., ) | |
| ) | |
| Defendants. ) | |

## CLASS ACTION COMPLAINT

COMES NOW, Plaintiff, Carlos Sanchez, on behalf of himself and others similarly situated and brings this civil action to recover damages against the above-named Defendants, and for their causes of action would show unto the Court, the following:

### NATURE OF THE ACTION

1.      Plaintiff, Carlos Sanchez, files this Class Action lawsuit on behalf of himself and all others similarly situated due to Defendants' routine and systematic failure to pay physicians for the services they provide to their patients.

2.      In particular, Defendants Team Health and Paragon do not pay Plaintiff and other Florida physicians for "Relative Value Units" (hereinafter "RVUs") earned when patients are treated by nurse practitioners and/or physician assistants (hereinafter "advance practice clinicians" or "APCs") under the physician's direction (hereinafter "Assisting RVUs").  By failing to pay these Assisting RVUs to the physicians, Defendants are in breach of their contracts, have deceived the physicians in violation of the Florida Deceptive Trade Practices Act ("FDTPA"), have

perpetrated wire and mail fraud in furtherance of a racketeering scheme in violation of the Racketeer Influenced and Corrupt Organizations Act (hereinafter "RICO Statute"), and have been unjustly enriched.

3.      Dr. Sanchez files this lawsuit on behalf of all doctors who live in the state of Florida, and have agreed to work for the Defendants.

## PARTIES, JURISDICTION, AND VENUE

4.      Plaintiff Dr. Carlos Sanchez is over the age of eighteen (18) years, and is domiciled in Dade County, Florida.

5.      Defendant Team Health, Inc. (hereinafter "Team Health") is a Tennessee corporation with its principal place of business in Knoxville, Tennessee.  Team Health did and does business in the State of Florida at all times material herein.

6.      Defendant Paragon Contracting Services, LLC (hereinafter "Paragon"), f/k/a Paragon Contracting Services, Inc. is a Florida limited liability company with its principal mailing address in Knoxville, Tennessee and its principal place of business in Fort Lauderdale, Florida. Paragon's sole member is Southwest Florida Emergency Management, Inc., a Florida corporation, with its principal place of business in Tamarac, Florida.  Paragon did and does business in the State of Florida at all times material herein.  Paragon is a separate legal entity but operates under Team Health's dominion and control, and at Team Health's direction, to perpetuate and form the scheme and enterprise explained further below.  Paragon acts as the agent of Team Health.

7.      This Court has jurisdiction over the class claims in this case pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. 1332(d), which explicitly provides for the original jurisdiction of the Federal Courts over any class action in which any member of the

2

Plaintiff Class is a citizen of a state from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.

8.     This Court also has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964.

9.     Plaintiff and all members of the Class allege that the total claims of the individual members of the proposed Plaintiff Class are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2) and (5).  As set forth below, Plaintiff is domiciled in Florida and a citizen of Florida, and Defendants are domiciled and considered citizens of Tennessee and Florida.  Therefore, minimal diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A).

10.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this Class Action Complaint occurred in this district, or alternatively, Defendants are both subject to the Court's personal jurisdiction with respect to this action.

## FACTS AND SCHEME

### Background

11.     Team Health is a national multi-billion dollar staffing company. Team Health, through its subsidiaries such as Paragon, has contracted with approximately 3,900 independent contractor physicians (including Plaintiff) in as many as 47 states to handle emergency care at approximately 3,300 hospitals across the country (collectively referred to as "Team Health Facilities" or "TH Facilities"). Because Defendants signed exclusive contracts with the TH Facilities, emergency care physicians cannot contract with the TH Facilities directly. The physicians must contract with Defendants in order to work in the emergency rooms of the TH

Facilities. In addition to physicians, Team Health contracts with physician assistants and nurse practitioners (collectively referred to as "Advance Practice Clinicians" or "APCs") to treat patients under a physician's direction.

12.     Under Defendants' contracts with the TH Facilities and Plaintiffs, referred to as Medical Professional Independent Contractor Agreements, Defendants make money based on the number of patients each physician is responsible for during his/her shift, and the services provided to each patient. Defendants make less money on a physician if he/she is unproductive on duty. Conversely, Defendants make more money on a physician if he/she is industrious and takes on responsibility for more patients.

13.     TH Facilities include, among many others: Palmetto General Hospital in Hialeah, Florida, North Shore Medical Center in Miami, Florida, Florida Medical Center in Davie, Florida, and Florida Medical Center in Fort Lauderdale, Florida.   TH provides emergency medical services through administrative offices located several regional sites.

**The RVU Bonus Program**

14.     At least as early as 2012, Defendants sought to add a bonus program to the contracts of the physicians at TH Facilities in order to incentivize the physicians to take on responsibility for more patients during each shift, so Defendants could bill more and make more money. This program was motivated by the need to attract and retain the best possible physicians to the TH Facilities and their markets, and was presented to the physicians as a way for them to make more money as well.

15.     Defendants' bonus system relies on "relative value units" ("RVUs") to determine the amount of each physician's bonus. RVUs assign a value to each service provided and the resources used to provide that service.

4

16.     RVUs are generated when physicians see the patients directly and when they supervise APCs who treat patients under the physician's direction. RVUs generated through Plaintiffs' supervision of APCs without seeing the patient directly are referred to as "Assisting RVUs." Receiving bonus credit for the Assisting RVUs is critically important to the physicians at the TH Facilities.

## The Importance of Assisting RVUs

17.     The importance of physician credit for Assisting RVUs is easiest understood in the context of patient charts and the liability risk that physicians assume in signing those charts. A physician is responsible for every patient whose chart he/she signs, whether he/she sees the patient directly or simply supervises an APC's treatment plan.

18.     At TH facilities, every patient chart requires a physician to sign his/her name, attesting to the fact that he/she is taking personal responsibility for the patient's treatment. These physician signatures also allow Defendants to increase their billing and collections with various insurers and lower Defendants' exposure to liability.

19.     If a physician sees a patient directly, Team Health used an attestation such as the following in the patient's chart:

> I personally evaluated and examined the patient in conjunction with the MLP ("Mid-Level Provider") and agree with the assessment and treatment plan and disposition of the patient as recorded by the MLP (an MLP is the same thing as an APC).

20.     When an APC sees a patient under the physician's direction, the physician is responsible for the patient's diagnosis and treatment, and either works with the APC to formulate a treatment plan, or, if the APC has already created a treatment plan, reviews and makes changes to the plan to ensure that it is appropriate. In this situation, Team Health uses a different default

5

attestation in the patient's chart. The following is a sample of language used by Team Health in such circumstances:

> I was personally available for consultation in the emergency department. I have reviewed the chart and agree with the documentation as recorded by the MLP, including the assessment, treatment plan and disposition.

21.     A physician signs an attestation on every patient chart, including charts where he/she assisted the APC but did not see the patient directly.

22.     Regardless of whether or not a patient is directly seen by a physician, the patient's chart and attestations therein, as well as the contracts discussed below, all recognize that a physician takes on considerable responsibility for every patient's diagnosis, treatment and disposition, and that he/she spends significant time assisting patients by consulting with APCs and reviewing patient charts.

23.     Physicians can be held liable for the treatment provided to a patient, regardless of whether the physician saw the patient directly or supervised the APC's treatment plan. In fact, multiple physicians have been sued even though they did not see the patient personally because they supervised an APC and signed off on patient charts.

24.     For that reason, when Defendants recruited Plaintiff to participate in the RVU bonus program, Plaintiff was assured that, along with the liability he was assuming, he would receive credit for RVUs generated through his supervision of APCs.

25.     Although Defendants represented to Plaintiff that Plaintiff would be paid bonus credit for RVUs earned by assisting and supervising APCs, they have failed and refused to pay Plaintiffs accordingly.

26.     In fact, Plaintiff tried multiple times to contact Team Health and Paragon representatives to ascertain which RVUs he was being paid for.  The Defendants failed to provide him with accurate data to review himself, and ultimately, after persistent questioning, admitted that they do not pay physicians for Assisting RVUs.

27.     This systematic, uniform, and routine refusal to pay physicians for Assisting RVUs is the "Scheme" perpetrated by both Defendants.

### **The Contracts**

28.     Defendants were required to give Plaintiff RVU bonus credit for Assisting RVUs under the terms of his contract.

29.     The contract Plaintiff entered into with Defendants provided RVU credit for supervision of APCs.  According to the "North Shore" section of Plaintiff's contract, Plaintiff is to be paid in the following manner:

> 3.2.1.2     In the event Company and/or Company's affiliate has supplied the services of nurse practitioners and/or physician assistants during that Prior Billing Cycle, determine:
>
> 3.2.1.2.1 the percentage of hours Professional worked when compared to total hours worked by all physicians eligible to participate in the Plan (the "Eligible Physicians") during that Prior Billing Cycle ("Professional's Plan Hours Percentage")
>
> 3.2.1.2.2 the Total RVU's generated by nurse practitioners and/or physician assistants while providing their services under the direction of Eligible Physicians and whose patient charts have been documented and signed off on by Eligible Physicians during that Prior Billing Cycle ("APC Total RVUs"):
>
> 3.2.1.2.3 Professional's portion of APC Total RVU's for that Prior Billing Cycle (Professional's APC RVU's") by multiplying the APC Total RVU's for that Prior Billing Cycle by Professional's Plan Hours Percentage;

3.2.1.4 Professional's Total RVU's for that Prior Billing Cycle ("Professional's Total RVU's") as the sum of the Total RVU's generated by Professional during that Prior Billing Cycle and Professional's APC RVU's.

For purposes of this Agreement, the term "Relative Value Unit" shall correspond to that number assigned to the service as published by the Centers for Medicare and Medicaid Services for the appropriate CPT Code, which number was in effect at the time the service was provided.

3.2.1.3 Pay Professional an amount equal to (i) Professional's Total RVU's for the applicable Prior Billing Cycle multiplied by $16.60 (the North Shore RVU Multiplier") less (ii) the product of Professional's total clinical hours worked during that Prior Billing Cycle multiplied by Professional's base hourly rate in effect that Month for day shifts in the Emergency Department at North Shore.

30.    The "FCU Fort Lauderdale" RVU Plan section has similar language:

3.5.1 Within fifteen (15) days after the end of each calendar month (a "Month") during the term of this Agreement, Company shall, in accordance with its accounting procedures:

3.5.1.1 Determine the total Relative Value Units ("Total RVU's") generated by Professional in the Emergency Department at FMC-Ft. Lauderdale ("Professional's Total RVU's") during Company's billing cycle that ended in the last preceding Month (the "Prior Billing Cycle"). In the event Company and/or Company's affiliate supplies nurse practitioners and/or physician assistants in the Emergency Department at FMC-Ft. Lauderdale, Professional's Total RVU's shall include Total RVU's attributable to nurse practitioners and/or physician assistants while providing their services under Professional's direction and whose patient charts have been documented and signed off on by Professional during that Prior Billing Cycle. For purposes of this Agreement, the term "Relative Value Unit" shall correspond to that number assigned to the service as published by the Centers for Medicare and Medicaid Services for the appropriate CPT Code, which number was in effect at the time the service was provided.

3.5.1.2 Pay Professional an amount equal to (i) Professional's Total RVU's for the applicable Prior Billing Cycle multiplied by $18.45 (the "FMC-FT Lauderdale RVU Multiplier") less (ii) the product of Professional's total clinical hours worked in the Emergency Department at FMC-Ft. Lauderdale during that Prior Billing Cycle

8

multiplied by Professional's base hourly rate in effect that Month
for day shifts in the Emergency Department at FMC-Ft. Lauderdale.

31.     Under Plaintiff's contract, Defendants have no discretion in how they count or credit the RVUs; they cannot refuse to count the Assisting RVUs or fail to credit them toward Plaintiffs' total RVUs.  Yet they do in furtherance of the Scheme to defraud Plaintiff and the putative class of rightfully owed payments.

**Defendants' Breach**

32.     Plaintiff, individually and on behalf of the Class, believed that the data on his weekly paychecks and paystubs reflected bonus credit for the RVUs generated through every chart they signed.

33.     However, Defendants were secretly subtracting out the Assisting RVUs from the bonus credit on each paycheck, but failing to disclose this fact or provide Plaintiff with sufficient data to ascertain the truth.  Again, Plaintiff requested this data on multiple occasions but was never provided the data. Rather than provide the requested data, the Defendants themselves admitted they do not provide bonus credit for Assisting RVUs.

34.     Defendants represented to Plaintiff that they would receive bonus compensation for all RVUs generated through the services they provided and that the services they provided included supervision of APCs. Plaintiff relied on these representations in joining and remaining as a Team Health provider.

35.     Because the contracts promised to compensate Plaintiff with a bonus for his supervision of APCs, Plaintiff believed the numbers and amounts on his paychecks accurately represented full compensation for Assisting RVUs.

36.     In actuality, the Assisting RVUs were being subtracted from Plaintiff's bonus calculations systematically as part of the Defendants' Scheme.

9

37.     Because the underlying data was hidden from Plaintiff, he could not determine that he was being cheated. However, Defendants recently admitted that it is their policy not to pay Assisting RVUs in the Southeast region. Despite admitting that they are not paying for Assisting RVUs, Defendants have persisted in their scheme to defraud Plaintiffs and have not paid back the bonus money taken or corrected the problem moving forward.

38.     In sum, all Team Health doctors in the state of Florida were promised to be paid for Assisting RVUs, which is apparent from the uniform parts of all their contracts.  Team Health, through its various agents, including Paragon, contracted with the doctors in the putative class, are now in breach of those contracts, and have misled Plaintiff and the putative class into believing they would be paid for Assisting RVUs.  This conduct is in violation of the FDUTPA because it is misleading, unfair, unconscionable, and deceptive.

39.     Both Defendants acted in concert with one another throughout the United States to violate the RICO statute through a pattern of racketeering activity for personal, financial gain, to fraudulently convey false and misleading information concerning the payments to healthcare providers at Team Health facilities.  The pattern of racketeering was perpetrated by both Defendants.  These concerted efforts resulted in significant financial harm to the doctors employed at Team Health facilities, including the Plaintiff and the putative class.  But for the actions and inactions of Defendants, individually, jointly, and in concert with one another, Plaintiff would have been paid for all services provided and performed at the Team Health facilities, including but not limited to Assisting RVUs.  Defendants' actions and inactions make them each individually liable and responsible for Plaintiff's injuries and damages as described herein.

## CLASS ALLEGATIONS

40.    Plaintiff, individually and on behalf of the Class, bring this class action against

Defendants pursuant to Fed. R. Civ. P. 23, on behalf of:

> **All physicians domiciled in Florida who: (a) provided
> emergency medicine services at current or prior TH Facilities,
> pursuant to Medical Professional Independent Contractor
> Agreements that contained contract language identical to or
> similar to the language cited in paragraphs 29 and 30, *i.e.*, that
> provide bonus credit for physician services and require
> oversight of APCs but do not explicitly exclude bonus credit for
> RVUs generated through oversight of APCs; (b) provided
> assistance and supervision to said APCs, and (c) have not been
> given bonus credit for those RVUs.[1]**

41.    The members of the Class are so numerous that joinder of all members is

impracticable. While the exact number of Class members is unknown at the present time, it is

estimated that there are thousands of members in the Class.

42.    Despite the numerical size of the Class, the identities of the Class members can be

ascertained by Defendants' employment, contract, and accounting records. Plaintiff and his

counsel do not anticipate any difficulties in the management of this action as a class action.

43.    Plaintiff will fairly and adequately represent the interests of the Class. Plaintiff is

committed to vigorously prosecute this action and have retained competent counsel experienced

in class action litigation. Plaintiff and Class members and have no interests antagonistic to or in

conflict with other Class members. Plaintiff is represented by lawyers who have had extensive

experience in prosecuting class actions and will adequately represent the purported Class in this

action.

---

[1] Plaintiff is aware that there are some contracts used by the Defendants that simply state that providers are to be paid through RVU bonus credit for "the services provided by Professional during Company's last billing cycle". These providers are also included in Plaintiff's Class Definition. At a later date, said providers may function as a subclass if the Court deems necessary but for the purposes of this Class Action Complaint, they are to be included in the Class Definition.

44.     This action raises numerous questions of law and fact common to the Class members, which predominate over any questions that may affect particular Class Members.  Such common questions of law and fact include but are not limited to the following:

a.     Whether Defendants had a policy or internal guideline against giving bonus credit for Assisting RVUs, in whole or in part;

b.     Whether Defendants' contracts required Defendants to pay for Assisting RVUs;

c.     Whether Defendants failed to pay physicians for Assisting RVUs;

d.     Whether Defendants conduct misled or was likely to mislead physicians that they were not being given bonus credit for Assisting RVUs;

e.     Whether Defendants committed wire and mail fraud by deceiving physicians into agreeing to work at their facilities that would pay for Assisting RVUs but in fact did not intend to;

f.     Whether Defendants' actions were unfair, unconscionable, deceptive, misleading, or likely to mislead physicians like the Plaintiff;

g.     Whether Defendants engaged in a fraudulent scheme;

h.     Whether Defendants violated 18 U.S.C. § 1962;

i.     Whether or not Plaintiff and putative class were harmed by Defendants' conduct; and

j.     Whether Defendants had a contractual duty to give bonus credit for Assisting RVUs.

45.     The claims or defenses of the represented parties are typical of the claims or defenses of the Class. Plaintiff has the same interests as the other Class members in prosecuting the claims against Defendants. Plaintiff and all the members of the Class sustained damages as a result of Defendants' wrongful conduct.

46.     Additionally, Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Common issues predominate. Furthermore, the expense and burden of individual litigation make it extraordinarily difficult for Class members to redress the wrongs done to them individually.

## COUNT ONE

## BREACH OF CONTRACT

47.     Plaintiff, individually and on behalf of the Class, incorporates by reference all of the factual allegations contained in the preceding paragraphs of this Complaint.

48.     Plaintiff and all members of the Class entered into a valid contract with both Defendants, binding on all the parties.

49.     Plaintiff and all members of the Class performed under the contracts serving patients in the emergency room at TH Facilities for all or part of the preceding six (6) years.

50.     Plaintiff and all members of the Class earned RVU-based bonuses under the terms of the contracts that Defendants failed to pay.

51.     As a proximate result, Plaintiff and all members of the Class were damaged.

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, demands judgment against Defendants for damages, including legal fees and costs, in an amount that would be just and proper under the circumstances and under the laws of the State of Florida and the United States of America.

## COUNT TWO

### UNJUST ENRICHMENT

52.     Plaintiff, individually and on behalf of the Class, incorporates by reference all of the factual allegations contained in the preceding paragraphs of this Complaint.

53.     Defendants wrongfully retained a benefit from Plaintiffs.

54.     It is unjust and inequitable for Defendants to withhold bonus compensation owed to Plaintiff for the services, supervision, and assistance that he provided.

55.     Defendants knowingly, intentionally and fraudulently failed to compensate Plaintiff for the benefit conferred.

**56.**     As a proximate result, Plaintiff was damaged.

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, demands judgment against Defendants for disgorgement, legal fees, and costs, in an amount that would be just and proper under the circumstances and under the laws of the State of Florida and the United States of America.

## COUNT THREE

### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT (FDUTPA), SECTIONS 501.201, *et. seq*., FLORIDA STATUTES (2005)

57.     Plaintiff, individually and on behalf of the Class, incorporates by reference all of the factual allegations contained in the preceding paragraphs of this Complaint.

58.     This cause is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Sta. § 501.201 et seq. (the "Act" or "FDUTPA").  The stated purpose of the Act is to "protect the consuming public… from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

59.     Plaintiff is a consumer as defended by Fla. Stat. § 501.203 and has standing to pursue this claim because he was exposed to Defendants' representations regarding payment of services performed, particularly RVUs, including Assisting RVUs, has suffered injury in fact in that he has lost money as a result of Defendants' actions as set forth above.

60.     Fla. Stat. § 501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce".

61.     Defendants' conduct alleged herein violates the legislatively declared policies in the FDUTPA.  Defendants misled Florida doctors into believing that they would be paid for all services performed and all RVUs, including Assisting RVUs, but Defendants did not pay Plaintiff and the putative class for these services performed.

62.     As a result of Defendants' "unfair" and "deceptive" conduct, Plaintiff and the members of the Class entered into agreements with the Defendants that they would not otherwise have agreed to and did not receive the agreed upon payment.

63.     Defendants have violated the Act by engaging in the unfair and deceptive practices as described herein that offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.

64.     Plaintiff and the Class have been aggrieved by Defendants' unfair and deceptive practices because they were not paid for all services performed even though Defendants represented they would pay for said services such as the Assisted RVUs.

65.     The damages Plaintiff and the Class suffered were directly and proximately caused by the deceptive, misleading, and unfair practices of Defendants as more fully described herein.

66.     Pursuant to Fla. Sta. §§ 501.211(s) and 401.2105, Plaintiff and the Class seek damages, attorneys' fees, and costs of prosecuting this action.

67.     Pursuant to Fla. Stat. § 501.211(1), Plaintiff and the Class seek a declaratory judgment and Court Order providing an accounting of the Assisting RVU's Defendants have not paid, and enjoining the above-described wrongful acts and practices of Defendants, and for restitution and damages.

**WHEREFORE**, Plaintiff, individually and on behalf of the Class demands judgment against Defendants for damages, attorneys' fees, and costs, in an amount that would be just and proper under the circumstances and under the laws of the State of Florida and the United States of America.

## COUNT FOUR

## VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)

68.     Plaintiff, individually and on behalf of the Class, re-alleges and incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

69.     This claim arises under 18 U.S.C. § 1962(c), which provides in relevant part: (c) it shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…

70.     This count is against Defendants Team Health and Paragon who at all relevant times were deemed a "person" within the meaning of 18 U.S.C. §1961(3), because they were "capable of holding a legal or beneficial interest in property".

71.     The activities of the Defendants created an enterprise that is used as a tool to carry out the Scheme and pattern of racketeering activity.  The enterprise is engaged in and conducts activities that affect interstate commerce.  Defendants Team Health and Paragon are associated with the enterprise.

72.     The Defendants are a group of "persons" associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint. These Defendants form this association in fact for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity. Each of the Defendants participated in the operation of or management of the enterprise. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. There may be other members of the enterprise who are unknown as this time, but which will be uncovered during discovery.

73.     Defendants Team Health and Paragon agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding the Plaintiff and putative class.

74.     Specifically, the Defendants conspired and defrauded the Plaintiff and the putative class by representing and contracting with Plaintiff to pay physicians for Assisted RVUS in their Team Health contracts, but intentionally and uniformly refusing to do so.

75.     Pursuant to and in furtherance of their fraudulent scheme, the Defendants committed multiple related acts of wire and mail fraud, including but not limited to all contracts entered into with Team Health doctors, all assisted RVUs Team Health received payment for but

17

never paid its doctors for, and all payments made to doctors that were not for the full amount owed, including the Assisted RVUs.

76.     The Defendants' routine and systematic refusal to pay for Assisted RVUs constitutes a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

77.     The racketeering activity, through the use of the interstate mails and wires, was made possible by Defendants' regular and repeated use of the services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violations alleged herein.

78.     The Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

79.     The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous in that they have continued to systematically refuse to pay for Assisted RVUs. There was repeated conduct during the past six years, for Defendants Team Health and Paragon, and there is a continued threat of repetition of such conduct.  Specifically, the Defendants committed the following recent acts of wire and mail fraud:

   a.     On March 13, 2017, the Defendants entered into an agreement with Plaintiff Dr. Sanchez in which they promised to pay for Assisting RVUs.

   b.     By April 15, 2017, the Defendants intentionally did not pay Plaintiff for all Assisting RVUs.

   c.     By May 15, 2017, the Defendants the Defendants intentionally did not pay Plaintiff for all Assisting RVUs.

   d.     By June 15, 2017, the Defendants intentionally did not pay Plaintiff for all Assisting RVUs.

e.   By July 15, 2017, the Defendants intentionally did not pay Plaintiff for all Assisting RVUs.

f.   By August 15, 2017, the Defendants intentionally did not pay Plaintiff for all Assisting RVUs.

g.   By September 15, 2017, the Defendants intentionally did not pay Plaintiff for all Assisting RVUs.

h.   By October 15, 2017, the Defendants intentionally did not pay Plaintiff for all Assisting RVUs.

i.   By November 15, 2017, the Defendants intentionally did not pay Plaintiff for all Assisting RVUs.

j.   By December 15, 2017, the Defendants intentionally did not pay Plaintiff for all Assisting RVUs.

k.   By January 15, 2017, the Defendants intentionally did not pay Plaintiff for all Assisting RVUs.

l.   By February 15, 2017, the Defendants intentionally did not pay Plaintiff for all Assisting RVUs.

m.   By March 15, 2017, the Defendants intentionally did not pay Plaintiff for all Assisting RVUs.

n.   Throughout the entirety of the relationship between Plaintiff Dr. Sanchez and Defendants Team Health and Paragon, the Defendants intentionally did not pay Plaintiff for his Assisting RVUs.

o.   Each time the Defendants received payment for an Assisting RVU, they committed mail and wire fraud in violation of the RICO statute because they failed to pay the Plaintiff for the services he provided.

80.   Defendants intentionally caused the Plaintiff to enter into the agreement to work for Team Health facilities, and never intended to pay Plaintiff for Assisting RVUs.

81.     As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiff and the putative class have been injured in their business and property in that they have not been paid for all services rendered, including Assisted RVUs.

**WHEREFORE**, Plaintiff, on behalf of himself and the class he seeks to represent, requests that the Court enter judgment against the Defendants for actual damages, treble damages, attorney's fees, costs, and any other damages the Court deems just.

## COUNT FIVE

## DECLARATORY JUDGMENT, INJUNCTIVE RELIEF, AND ACCOUNTING

82.     Plaintiff, individually and on behalf of the Class, incorporates by reference all of the factual allegations contained in the preceding paragraphs of this Complaint.

83.     This Count is brought to determine the rights and duties of the Parties under various Medical Professional Independent Contractor Agreements described paragraphs 29 and 30 above.

84.     A controversy exists between the Parties and Class members as to Plaintiffs' rights to bonus compensation for assistance and supervision of APCs as described in paragraphs 29 and 30 above.

85.     Plaintiff and the Class seek a Declaratory Judgment by the Court pursuant to 28 U.S.C. §§ 2201-2202 determining the rights of Plaintiff and the Putative class, and injunctive relief affording an accounting, restitution, and future payment of all Assisting RVUs.

**WHEREFORE**, Plaintiff and the Class seek a declaratory judgment and Court Order providing an accounting of the Assisting RVU's Defendants have not paid, an Order indicating that this is a proper case for declaratory judgment relief, that there is a bona fide controversy among the Parties and, that upon final hearing, the Court declare that Plaintiffs and Class members are

entitled to bonus compensation for assistance and supervision of APCs, legal fees and costs and such other relief as they are entitled.

## PRAYER FOR RELIEF

Plaintiff, on behalf of himself and the Class, requests that the Court Order the following relief and enter judgment against the Defendants as follows:

A.   An Order certifying the proposed Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and his counsel to represent the Class;

B.   A declaration that Defendants have engaged in the illegal conduct described herein;

C.   An Order awarding declaratory and injunctive relief as permitted by law or equity, including permanently enjoining Defendants from continuing their unlawful practices as set forth herein;

D.   A judgment awarding Plaintiff and the Class actual damages, punitive damages, and restitution in an amount according to proof and all other entitled awards under the FDUTPA;

E.   Ordering Defendants to engage in a corrective marketing campaign to current and future healthcare providers;

F.   An accounting of the Assisting RVUs Defendants refused to pay Florida physicians;

G.   Awarding attorneys' fees and costs incurred in prosecuting this action;

H.   Pre-judgment and post-judgment interest; and

I.   All other relief that the Court deems necessary, just, and proper.

21

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff, individually and on behalf of the Class, hereby

demands a trial by jury.

Respectfully submitted,

/s/ Joshua R. Gale
Joshua R. Gale, Esquire
Florida Bar # 63283
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB LLC
101 N. Woodland Blvd. Ste. 600
DeLand, Florida 32720
Telephone: (386) 675-6946
Facsimile: (386) 675-6947
Email: JGale@wigginschilds.com

*Attorney for Plaintiff and Plaintiff Class*

**OF COUNSEL:**
WIGGINS CHILDS PANTAZIS
FISHER GOLDFARB LLC
D. G. Pantazis, Jr.
The Kress Building
301 Nineteenth Street North
Birmingham, Alabama 35203
Telephone:   (205) 314-0557
Facsimile:   (205) 314-0785
Email:       dgpjr@wigginschilds.com

## SERVE DEFENDANTS BY CERTIFIED MAIL AT:

| | |
|---|---|
| Team Health, Inc. | Paragon Contracting Services, LLC |
| c/o its registered agent | f/k/a Paragon Contracting Services, Inc. |
| Corporation Service Company | c/o its registered agent |
| 1201 Hays Street | Corporation Service Company |
| Tallahassee, Florida 32301-2525 | 1201 Hays Street |
| | Tallahassee, Florida 32301-2525 |

22